Your Honor, Nick Suriel for the appellant, Mike Franquinha, co-counsel. Your Honors, may it please the Court. Your Honors, this case is about a man who kept his word, did what he said he would do, and the people that assured him they would keep their word have vanished. And he's left at the mercy of this Court to seek justice. Your Honors, this Court has — I mean, this case has many unanswered questions. We believe that the appointment of a special master is required. Mr. Morgan has not been cross-examined. Mr. Morgan has — has knocked on three different courts' doors, the Immigration Judge, the Board of Immigration Appeals, and the Federal District Court. Each court, we have not found any satisfaction. For three years, we were before the Immigration Judge. We attempted — we contacted every — every actor. The only person that still was able to assist us was the U.S. Attorney from 1982, Mr. Dunbar, who hails from the great State of Montana. And Mr. Dunbar wrote an affidavit in 2003 saying, yes, this was a critical witness. This was a critical actor who helped in a very significant case that — that the government brought in Montana. Mr. Morgan acted, and he was induced to act. That action has caused him to be placed in the situation he is now in — in danger. And so, Your Honors, there's really no record that we've been able to develop because, as — as the government argues in this instance as well, he should not have his day in court. Basically, his due process rights are being abrogated at every turn. Is your theory promissory of stuff?  Could you have raised that before the Board? No, Your Honor. Why? Your Honor, we — What prevented you from raising that before the Board? The — the — the Board of Immigration Appeals told us clearly that they would not entertain any constitutional arguments. Promissory estoppel is not constitutionally based. I understand, Your Honor. But the inducement that Mr. Morgan was — was — the inducement of his actions and then his — his act, we believe that, well, that — that really is the — the — it's an issue that was not litigated. With the summary affirmance that we got from BIA did not address the issue. We did raise the issue of the S visa that we believe that he's eligible for. At any point, either before the immigration judge or the Board of Immigration Here's what we would prove if we were allowed to? Yes, Your Honor. For — say for three years, we contacted all the actors, the DEA, the FBI, the U.S. Attorney's Office. I misunderstand my question. I'm sorry, Your Honor. At any point before the IJ or the BIA, did you, in writing or in a transcript that would be part of any record, tell them what your promissory estoppel case specifically consisted of? No, we did not, Your Honor. Was there anything preventing you from doing that? No, Your Honor. Why don't you tell us what the case is? Absolutely. Take two minutes and tell us what the case is. Okay, Your Honor. Thank you. This case is about a man who essentially could have just returned to England back in 1982. But rather, he was induced to act. And by cooperating with the U.S. Attorney's Office, as you'll see, as you saw in the — in the record, the only thing we have is the affidavit from the U.S. Attorney's Office in 1983. Essentially, the agreement was in place. Mr. Morgan did perform. And so by so doing, he established a well-settled life. Did anyone ever tell him he could stay here forever? I don't know that the word forever was used, but he was — Indefinitely? Indefinitely, yes. Who told him that? The U.S. Attorney did. Is that in his affidavit? Yes, it is, Your Honor. That he could stay here indefinitely, whether he was working, cooperating with the government or not? To this day, Your Honor, Mr. Morgan is working lawfully in the United States. He's risen. He's rehabilitated himself. He's risen within many of the American Express Corp. Where in the former U.S. Attorney's affidavit does it say that someone from the government promised Mr. Morgan that he could stay in the United States indefinitely? The affidavit from 2003, Mr. — which Mr. Dunbar submitted, indicates that there was an agreement and that Mr. Morgan did perform on that agreement. So he did provide the government with critical information. But that affidavit doesn't seem to say anything about the deal we made at the time was such-and-so, that the affidavit indeed speaks in terms as the argument that the immigration court, in terms of qualifying for an S-visa contempt as a current thing, not something that was done years ago. Right. Well, one of the — one of the arguments the government makes is that the S-visa is only prospective in nature, and that's incorrect. I mean, the — the critical nature of his testimony, critical nature of his assistance But my point is, in your papers, I think, they're very carefully and probably candidly I see descriptions that say it was your client's understanding that this is what was going to happen. But that's not quite the same thing, I think, is what you need for promissory estoppel. Exactly the reason why we need a special master, Your Honor, because there is a real lack. I mean, go ahead. Cross-examine Mr. Morgan. Let's go ahead and get the — the actors that were part of this. Basically, everybody is vanished. They've either retired, died, or it's — this is — this leaves Mr. Morgan in an untenable situation where we cannot establish the exact nature of the agreement because of the age of the case. Except the truth of everything that's in the former U.S. Attorney's affidavit or even the arguments you've made, it sounds like he cooperated with the government and helped them in the past, 13 years ago or so. Twenty-five. Thirteen years ago prior to the I.J. hearing. But I couldn't find anything in there that indicated that someone from the government said you can stay and live here indefinitely. And there is a way to do that, isn't there? There's a formal process by which a person in Mr. Morgan's claimed circumstance can obtain relief from the government, right? Correct. Through the filing of the — And that's never happened. That's never happened. And there's been no one that has come forward who has — who has knowledge of what — what Mr. Morgan did to — to begin that process of filing out the I-854. Why the remedy of a special master as opposed to the district court? There is a — there is a statute that allows us to transfer cases to the district court when a hearing is — we believe that genuine issues of fact exist on the administrative record, and the hearing wasn't held before the agencies. Why not use that statute as opposed to a special master? Well, we have — we have requested, and the — and the government has — has opposed the statute that we asked under — essentially, we've been denied. And remember that this case was — was — began as a habeas corpus case, which was transferred as a result of the REAL-ID. Yes. No, that's the problem with the REAL-ID Act. It doesn't allow the development of evidence, as could occur under a pre-REAL-ID Act. Your Honor, I see that my two minutes are — I would like to reserve some time for rebuttal. Okay. Thank you for your argument. You've got about two minutes for rebuttal. We'll hear from the Attorney General at this time. Mr. McLaughlin. Good morning, Your Honor. May it please the Court, my name is Andrew McLaughlin, and I represent the Respondent Attorney General of the United States in this case. Although on some levels it almost appears that I could appear in front of you as I did yesterday and offer you the chance to have me sit down because there — no issue remains because this Court is bound by its prior precedent, there's a little bit more to this case, so I — I think there's more that I need to address in front of you. Mr. Morgan is an aggravated felon, drug trafficker, who never sought any relief under the immigration statute or, frankly, any other statute. He never sought any relief. In this case, he has requested the Court simply create relief for him out of whole cloth based on a substantive constitutional right or ignoring the Court's prior precedent. In this case, there simply is no evidence of danger supporting a State-created danger claim, and there is no evidence of a agreement — a written agreement of any kind, much less an unambiguous written agreement addressing the issue of his permanent presence in the United States. How could he develop the evidence? How — in which — in which sense? In terms of the — in terms of the record you're on? Sure. The — the BIA takes the position, and we've affirmed that, that they are not empowered to decide substantive constitutional questions, right? With a model — Procedural due process questions, certainly.  The BIA has also said, we are not empowered to hear estoppel claims, Hernandez-Puente and other cases. And the reason is that they only have — they can only exercise the — the discretion given them by the Attorney General, and that does not include finding estoppel. That's for the courts. So the estoppel claims could not be developed, in my view, nor could the substantive constitutional claims. So how could he develop his evidence in front of the agency? There's — there's two answers to that. The first answer is that, with respect to the — the whole panoply of arguments and facts that he's addressing, all of those would have been relevant to a application for protection under the Convention Against Torture, and he could have made that, and it would all be in the record, and all of the relevant fact-finding up to the very ultimate decision would be in the record and would have been made for you. The second answer is — But does the — does the presence of another remedy mean that it excludes this remedy? Because we have held in other cases that applicants can raise equitable estoppel claims in habeas, which is now under our jurisdiction, under Real ID. That's correct. But in most cases and in most courts, and there are some cases — I can't remember the name of the case where this Court addressed this particular point. Because the issue can be considered by the Board in connection with its other — over — in connection with applications or issues — Well, I'm not sure that really applies here. I mean, you could have — it is true that the State-created danger argument leads to the suggestion that he's in peril if he's removed to England, but you could have an agreement short of that. Let's just assume for a moment that the allegations are true and take it a step further. Suppose there was an express agreement between the U.S. Attorney's Office and the Petitioner that he cooperates on the — on the drug prosecutions, he'll be allowed to stay. Now we're here. How can he develop those facts? And who can adjudicate? We're not well-equipped to adjudicate the facts. My question leads over to a second one, I guess. I mentioned in the question Judge Thomas poses in terms of how do you develop the evidence, and I mentioned how we're supposed to adjudicate it under the Real I.D. Act because we're ill-equipped to be fact-finders. Let me give you a different example. A constitutional claim under the New Process Clause associated with ineffective assistance of counsel, that has slightly different implications than the claim that the BIA, the Board of Immigration Appeals, can adjudicate, that is, the obligation under the statute to provide a fair hearing. But the BIA has equated the two under an authority that it already exists, and it uses essentially the same standard, not completely the same standard as this Court might apply, but essentially the same standard. And in that context, the BIA takes the evidence, considers the evidence, makes virtually every fact-finding that this Court would require, and that's the — and that's appropriate. Give another example. But it doesn't happen in these kinds of cases. I understand what your argument is, but here's the problem I see more globally with the Real I.D. Act, and that is, it used to be when the habeas jurisdiction was in the district court, the district court could develop the facts when necessary. It's not always necessary. Sometimes you can do it on the bare record. But when it was necessary, the district court would have an evidentiary hearing, make findings, and then that would come up on appeal. Now that habeas jurisdiction has been transferred to us, how do we deal with those circumstances? Well, the first — I mean, your argument — I want you to divorce yourself from this case and speak more globally, because it's a real problem for me, because otherwise, I think there are some real constitutional problems with the Real I.D. Act. So how do we avoid that? The first point is, habeas jurisdiction is limited to issues of law. So we're talking — I'm sorry. We're limited to — we're not dealing with issues of fact and discretion for the most part. Well, for the most part, that's the problem. I understand. Beyond that, take it — let me give the other example. And the other example is the American-Era Supreme Court case example, in which the United States Solicitor General stood up and said, in the situation where you actually have a constitutional violation of this kind, a selective prosecution argument, we want that to be raised in front of the Board, because the Board can consider that as part of its analysis and under — under issues that are under its discretion. And the Board has the power to make fact-finding under those circumstances. How — how can the BIA declare a statute unconstitutional? It can't. It cannot. Those are the — the ultimate two steps don't exist. And it cannot stop the government. It can't say — it cannot say, by the virtue of your promises, you are a stopped — Department of Homeland Security is a stop from enforcing the law. It cannot, under that legal doctrine — the Board has other authority under which it can take other actions where it finds appropriate. I guess what I'm suggesting to you, though, on a — on a more global level, that there are some kinds of cases — this may or may not be one of them — in which the Board just doesn't have the jurisdiction. And it rejected the constitutional claims here, not on the merits, but saying, we don't have jurisdiction over it. So if the — the Board doesn't have jurisdiction, you can't fault the petitioners for not developing the claim. It just seems to me — now, this may or may not be one of those cases, but it seems to me that if — if we're presented with one of those claims, the appropriate remedy for us, rather than do our own fact-finding, which we're not empowered or shouldn't do, is to use the statute, transfer the case to the district court to make the factual determination, then — then hear it on habeas. Would you agree with that? Observing that, in this case, it doesn't exist. Public. Just as a global principle. The United States recognizes that there may be circumstances that arrive where a genuine issue of material fact remains that needs to be — for which the fact needs to be found. Our position is that under 2340 — 28 U.S. Code 2347b2, this Court can remand to the Board, as an executive agency, to continue its fact-finding and reach findings of fact on specific points, even points that the Board has previously declared are beyond its jurisdiction. So if you wanted to know whether or not the Board has the power to do that, the appropriate remedy is to go to the district court. And that's why we adopted that remedy in Gallo-Alvarez, because we can say fact-finding, and if that's a remedy that you're endorsing, that's fine. But somebody's got to find facts. The Board can't do the ultimate decision-making involved, but the Board can find every fact up to the point where you get to the point where, as this Court has said, the Board has the power to do that. And that's what's described in the Ramadan case, where you are — essentially, you're left with undisputed facts, and all you're doing is applying the law to it. So up to that point — What would be the harm in this case from sending it to the district court for a hearing? In this case, there simply is no evidence left to be found first. And second, there's no law to support any theory on the basis of which — It sounds like your response says we don't think Morgan can make out a case. Morgan has never alleged a case. He's never alleged a case that satisfies either this Court's precedent under Thomas v. INS. He doesn't — he doesn't allege it now, nor has he alleged a case that — that satisfies any standard under a State-created-danger claim that, frankly, shouldn't be recognized by this Court as the courts in the First Circuit and the Third Circuit have — have discussed in Inwanu and Kamara. So our position is — and that's the ultimate — that's the real reason that we feel we're here today, is to — to get this Court to uphold its decision in Thomas and to get this Court to agree with the courts in Inwanu and Kamara that there isn't a place for the State-created-danger claim. Those legal issues disposed of, there is no reason to send it back. Beyond that, there are no facts left. Except for Estoppel. If — if, in fact, a promise was made and the government broke the promise — There is no allegation by anyone that there was an unambiguous written promise that Mr. Morgan could remain in the United States. By using the phrase, unambiguous written promise, we don't know the record. That comes out of the Thomas case, Your Honor. Yeah. But it's — it's — There's no written promise at all. And, in fact, the evidence in this case says that they wouldn't have entered into such an agreement. Yeah. So there's simply no point in this case in remanding. This — this is so far beyond — I wouldn't be surprised if there was such a document in Montana. According to the — this is evidence from the district court record, not from the record in this case, but it indicates that no such agreement was entered into and no such written document would have been entered into if — if anyone had asked. It wasn't appropriate in this case because Mr. Morgan's conviction had — was already complete. He was on probation at the time, and he was approached to say, hey, would you — you know, would you help us with this investigation, and he agreed to do so. There was no quid pro quo involved. There was no agreement. There was no — He was on sentencing relief, didn't he? He was — he had already been sentenced, Your Honor. But he got some — some post-sentencing relief, didn't he? No, Your Honor. He was already on probation. He was — the judge entered a — he suspended the five-year sentence subject to probation and then waived the probation if he was deported. That was what — that's the reason the judge suspended the sentence. There wasn't relief in this case. Okay. You're over your time. Thank you for your argument. Rebuttal. Your Honor, there was, in fact, a suspension of the sentence that was part of the agreement. There was, in fact, written — in fact, when I went to the National Archives to find the court transcripts and the criminal proceedings, the case is so old that all the transcripts were no longer there. So there's definitely a lot of information that needs to be ascertained. So I completely disagree with the government on this point. In fact, there is no — the government hasn't produced the — that piece of — that document where the sentence was reduced. But if there were a written agreement, your client should have had a copy of it, right? Yes. Yes, I agree. And you've been unable to produce that? I'm sorry, Your Honor? And you haven't — you have not produced that or you're not — one doesn't exist? No, Your Honor. The only documents that we've been able to get were through a FOIA filing. So, you know, we're really hamstrung in this case, and we really — really believe that the evidence needs to be developed. Obviously, he was induced into acting. Why would he go forward if there was no promise? Why would he — The hope of getting favorable treatment down the line. Which — which we — we would submit to your — It would — it seems to me, looking back at it, probably what happened is that there were some, perhaps, general assurances made that you'll — maybe we'll take this into consideration in the immigration proceedings or something, and — and you may have relied on those. But I don't know if that's enough to get you to a theory of promise or a stop. I don't know. We agree. We agree, Your Honor. Thank you. Okay. Thank you both for your arguments. The case just argued will be submitted for decision.
judges: Hawkins, Thomas, Clifton